UNITED STATES of America,
Plaintiff-Appellee,

v.

Donna AMBROSE, Wayne Laglia, Leo
Patrick Morris,
Defendants-Appellants.

No. 81–5852.

United States Court of Appeals,
Eleventh Circuit.

June 20, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 15, 1983.

Jose J. Larraz, Jr., Miami, Fla., for Ambrose.

Channing E. Brackey, Brackey & Finkelstein, Fort Lauderdale, Fla., for Laglia.

Charles H. Vaughan, Fort Lauderdale, Fla., for Morris.

Asher E. Schroeder, Ralph Michael Hursey, Asst. U.S. Attys., Fort Lauderdale, Fla., for plaintiff-appellee.

Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

These three persons, apparently novices in the field, appeal from their conviction of a single indictment of possession with intent to distribute a controlled substance (methaqualone) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and with conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).

Because of the degree of coercion and pressure used by one Walter Kelly, a government informer, upon Donna Ambrose, if we are to accept her testimony as to what happened, we think it appropriate to consider what amounts to a "third party entrapment" defense by her co-defendants. This is the only ground of appeal that has sufficient weight to justify our dealing with it in this manner.

Ambrose testified that while her boyfriend was out of town on a vacation, his roommate, one Walter Kelly, sought her out and importuned her to find some source of illegal drugs to "take him off the hook;" that he had been approached by a Mafia figure from New York who was demanding a source of supply, and quickly. According to her testimony, they met together in a bar for a part of an afternoon, during which time he repeatedly told her that he was being threatened if he did not produce and that now that he had talked with her, her life also was on the line. She testified that she was greatly upset and distressed and refused several times to have anything to do with a deal, saying she knew nothing about any such source of drugs. Following further importunities in the evening, including his putting a gun in her face and physically threatening her, she took him home, because "he didn't have a car."

Ambrose testified that in the next few days, she met Walter Kelly again and that he persisted in calling her and making further threats. She telephoned a friend, Wayne Laglia, to tell him of her predicament and the threat against her life, and begged him to help her find a source of drugs in order to satisfy the informer. This call to Laglia produced results and, although he also testified that he responded to her request only because of his fear for her safety, he did telephone several persons and finally found one William Martin Kelly who said he could produce 100,000 methaqualone tablets.

In the meantime, according to undisputed evidence, Ambrose and Walter Kelly, together with the newly arrived "Mafia" man, who was a drug enforcement agent, waited in a motel room where they kept demanding that her sources produce the drugs at the agreed upon price.

At about 5:00 in the afternoon, following a promise from Ambrose to Walter Kelly that the deal could go down by about 2:00 p.m., William Martin Kelly and Laglia and one Leo Morris whom Laglia had originally called and who had, in fact, found William Kelly, the producer of the drugs, converged on the motel room where they were arrested.

It is not seriously disputed that during the three or four hours that they were in the room, Ambrose was actively trying to reach Laglia and he was in touch with Morris and/or Kelly. At one point the agents dumped on the bed some $75,000 in cash, which was counted by Ambrose and Laglia, and the deal was worked out for the price of the tablets.

The testimony of Ms. Ambrose as to threats against Walter Kelly's life and her own safety was not disputed by the government. The reason for this is that although Walter Kelly, the informer, had been paid $2900 for information and for a bonus in connection with the deal, he had disappeared by the time of the trial. The government was unable to produce him, in spite of a demand by the defendants.[1]

---

1. The failure of the government to produce the informer was the basis of a motion by the appellants to dismiss the indictment. The motion was also based upon their contention that

Ambrose and Kelly were the only witnesses to what was said between them.

The trial court's instruction to jury on entrapment follows:

Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that Government agents provide what appears to be a favorable opportunity is not entrapment. For example, it is not entrapment for a Government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction.

If, then the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the Defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that Government officers or their agents did no more than offer the opportunity, then the jury should find that the Defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the Defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the Government, then it is your duty to find him not guilty.

We are unable to find any place in the record in which the appellants objected to this charge, although the government does not rely upon their failure to do so. Instead, the appellants contend that they were entitled to have a further charge on entrapment given to the jury, because of the fact that neither Laglia nor Morris was threatened or coerced personally by the informer. Their asserted reason for participating in the scheme was that they had been told by Ambrose the threats against her, as outlined above, and they were acting for her protection. They requested the trial court to include the following charge:

You are instructed that a person may be brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which amount to an inducment, and that person is then able to avail himself or herself of the defense of entrapment, just as the person who receives the inducement directly.

You are further instructed that you may find that a person who received inducement indirectly may have been entrapped even if you find that the person who received the inducement directly was not entrapped.

The trial court declined to include this additional instruction.

■ As indicated above, the purpose for which this instruction was sought was to make it clear to the jury that when matters of inducement or entrapment were proven because of the conduct of agents of the United States in their approach to one of several defendants who then repeated the conversation to his co-defendants, including threats and the like, the co-defendants are entitled to the defense of entrapment, even though they were not directly approached by the government or its agents.

Although appellant Laglia states in his reply brief that: "Indeed the Fifth Circuit has concluded that inducement by a private citizen cannot support a claim for entrapment, *United States v. Maddox,* 492 F.2d

they were never furnished the name of Walter Kelly in response to the trial court's order. We do not reach this issue, because it was clear that ample notice of the identity of the informer was given to the defendants during earlier proceedings in the case, and because of the undisputed testimony by the government agent that he had made every effort to find Kelly, but was unable to do so.

104, 106 (5th Cir.1974); *United States v. Dodson,* 481 F.2d 656 (5th Cir.1973)." This Court has most clearly restated this principle of law in *United States v. Mers,* 701 F.2d 1321 (11th Cir.1983), there we said: "A defendant cannot avail himself of an entrapment defense unless the initiator of *his* criminal activity is acting as an agent of the government." At 1340. This opinion is, of course, binding on this Court unless and until overruled by the court sitting en banc. We, therefore, must decline to consider a decision of the Court of Appeals for the Second Circuit in *United States v. Valencia,* 645 F.2d 1158 (2d Cir.1980), cited by appellants in support of their contention.

Moreover, it appears that the appellants here may have obtained a better charge in their favor than they were entitled to, in light of our recent decision in *Mers, supra.* At the time the trial court in this case gave the charge, neither this Court nor its predecessor, the Court of Appeals for the Fifth Circuit, seems to have decided precisely that under no circumstances could a defendant claim entrapment based upon a communication to him by a fellow defendant who related to him that he had been threatened or importuned in a manner that would have entitled him to the submission of his entrapment defense to the jury.

The judge's charge in this case in no way directly limits the entrapment defense to the one person to whom the "law enforcement officers or their agents" communicated directly. The charge was thus a broader charge than these appellants were entitled to have given to the jury. We recognize that Ms. Ambrose's testimony as to the dire threats that had been made by the informer to her depicted seriously reprehensible conduct by the informer. However, the jury rejected this defense by her, so we must assume that at least some important parts of her testimony were not believed. There the matter must stand.

We conclude that we do not need to reach the precise question whether persons situated as were Laglia and Morris who establish by undisputed evidence that they have been brought into such a plan by a plea for help by their close friend, who told of the threats against her life, would be entitled to a jury trial on the issue of entrapment. In fact, if the trial court had been required to accept as true the testimony of the three defendants as to what it was that set up this deal in the first place, and the motivation of those who joined it, we would be inclined to view the government agent's conduct so reprehensible as to make it difficult not to reverse on due process grounds.

Unfortunately for these appellants, this issue was presented to the jury. The charge was broad enough to have permitted the jury to have acquitted these appellants. The jury rejected the defense, and there the matter must stand.

■ We find that the trial court made no error in the manner in which it handled the demand for information and the forced presence of the government informer. While a response was not made to the specific court order requiring information concerning this prospective witness, the information had been made available to the defendants and it is clear that at the time of trial, the government was unable to account for his present whereabouts.

■ The trial court did not err in overruling the motion to dismiss the indictment for a violation of the appellant's right to a speedy trial, either as a violation of the Sixth Amendment to the Constitution or under the Speedy Trial Act. As to the alleged denial of the defendant's rights under the Speedy Trial Act, this issue is not before us because it was not raised in the trial court.

These defendants were tried and convicted upon a superseding indictment, the first indictment having been dismissed by the trial court, acting *sua sponte,* on the ground that the government had not acted sufficiently promptly in bringing the case to trial. The trial court expressly stated that the dismissal was without prejudice. Thereafter, the government presented the matter a second time to a grand jury and the second indictment was filed on April 6,

1981. This was within a month of the dismissal of the first indictment. The trial of the defendants commenced on June 24, after several intervening motions transferring the case from one judge to another. In considering appellant's contention that they were denied a speedy trial under the Sixth Amendment, we note that the trial of the defendants was begun within a year and a week after the first indictment was filed. We also note that the order of dismissal of the first indictment was not made on the government's motion, thus obviating any suggestion that the government was attempting to start the time limits running anew after some default by it by dismissing the original indictment. *Cf. United States v. Hencye,* 505 F.Supp. 968, 971 (N.D.Fla. 1981).

▮ Both the government and appellants point to the case of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) as giving the standard by which a district court should weigh the factors in considering whether a defendant's Sixth Amendment rights had been violated. These factors are: (a) length of the delay; (b) reason for the delay; (c) defendant's assertion of his right; and (d) the prejudice to the defendant. Reviewing the sequence *in which the events occurred before the* dismissal of the first indictment, it is plain that the trial court would not have concluded that there was a Sixth Amendment violation of the defendant's right to a speedy trial. The court dismissed the indictment solely on the ground that the technical rules of the Speedy Trial Act had not been observed. The defendants *made no motion* for this order of dismissal, contending only that their Sixth Amendment rights had been violated. We agree with the trial court that there *was not an inordinate* delay in bringing the first indictment to trial. Considering (b) above, we agree that the reasons for delay were adequate. It is plain that as to the third factor, the defendants asserted their right in the trial court. As to the fourth, no showing was made as to the prejudice to the defendants other than that at the time the trial occurred the United States was unable to find the informer.

The difficulty here, is that the appellants were unable to show what testimony they had a reasonable expectation the informer would have given in their favor if he had been found. Instead, Ambrose's testimony went to the jury undisputed. It would be sheer speculation for either the trial court or for us to hold that the defendant had made a showing of prejudice to meet the *Barker* test.

▮ Finally, we conclude that the trial court did not err in overruling the motion to suppress based on the alleged failure of the DEA agents to "knock and enter" as provided under 18 U.S.C. § 3109. The record does not disclose whose room was being used for the completion of this transaction, although there is some testimony that it was rented by the informer. Moreover, there is evidence that the door was open when the agents entered to make the arrest. We conclude that the trial court did not err in overruling these motions to suppress.

The judgments are AFFIRMED.